IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

PROGRESSIVE ADVANCED INSURANCE
COMPANY                              :

    v.                              :    Civil Action No. DKC 16-1340

                     :

JASON COREKIN                        :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this
declaratory judgment action are cross motions for summary
judgment filed by Plaintiff Progressive Advanced Insurance
Company ("Progressive" or "Plaintiff") (ECF No. 25) and
Defendant Jason Corekin ("Mr. Corekin" or "Defendant"). (ECF
No. 26). The issues have been briefed, and the court now rules,
no hearing being deemed necessary. Local Rule 105.6. For the
following reasons, Plaintiff's motion for summary judgment will
be granted, and Defendant's cross motion for summary judgment
will be denied.

## I. Background[1]

Defendant claims that the insurance he had with Plaintiff
included $300,000 in uninsured motorist coverage. Plaintiff
contends that he waived full coverage and opted for the lower

---

[1] Unless otherwise noted, the facts outlined here are
undisputed.

amount of $100,000.[2]  The genesis of this dispute began on May 24, 2009, when Defendant created an online account and completed his electronic application for an insurance policy with Plaintiff.  As part of the application process, Defendant completed a page entitled "Notice Concerning the Waiver of Increased Limits of Uninsured Motorist Coverage in Maryland." (ECF No. 25-3 (emphasis in the original)).  The page contained a word-for-word reproduction of a Maryland Insurance Administration's ("MIA") model form that authorizes individuals to waive the default amount of uninsured motorist ("UM" or "UIM") coverage.  (*See* ECF Nos. 25-3; 25-8).  On the page, Defendant clicked a box which stated he was "affirmatively waiv[ing] [the default UM coverage] and instead elect[ing] to purchase lower uninsured motorists limits."  (ECF No. 25-4, at 2:02).  He then typed his name in the signature space of the page.  (*Id.* at 2:12).

On May 25, 2009, Plaintiff accepted the application and sent Defendant information about the new policy including the discount he received for using the online system.  (ECF No. 2 ¶ 17; ECF No. 2-1; ECF No. 3 ¶ 17).  From May 2009 until 2014, Defendant paid each of his policy premiums electronically.  (ECF

_____

[2] Uninsured motorist coverage is coverage a policyholder receives in the event of an accident with an uninsured, at-fault motorist.

2

No. 25-5, at 4). Defendant also communicated electronically with Plaintiff, conducted online transactions with Plaintiff, and received electronic copies of documents from Plaintiff. (*Id.* at 5). The Declarations Page consistently stated that Uninsured Motorist Coverage was $100,000 each person. (ECF No. 25-7).

On November 11, 2014, Defendant was in an automobile accident. After the accident, Defendant submitted a claim to Plaintiff for uninsured motorist coverage, and Plaintiff dispersed $100,000 to Defendant for the accident. On April 5, 2016, Defendant's counsel wrote to Plaintiff alleging that Defendant was entitled to an additional $200,000 because Defendant never effectively waived his right to the default UM coverage. (ECF No. 2-3).

On May 5, 2016, Plaintiff commenced this action seeking a declaration that Plaintiff had fulfilled its obligation under the insurance policy and that Defendant waived his right to the default UM coverage. (ECF No. 2). Defendant answered and counterclaimed seeking a declaration that he had not waived his right to the default UM coverage. (ECF No. 6). Plaintiff filed a motion for summary judgment, and Defendant responded and filed a cross motion for summary judgment. (ECF Nos. 25; 26).

## II.  Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  To prevail on a motion for summary judgment, the moving party generally bears the burden of showing that there is no genuine dispute as to any material fact.  *Liberty Lobby*, 477 U.S. at 248-50.  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.  In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union,* 424 F.3d 397, 405 (4th Cir. 2005), but a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v. Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted).

"When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." *Desmond v. PNGI Charles Town Gaming, LLC*, 630 F.3d 351, 354 (4th Cir. 2011). The court must deny both motions if it finds there is a genuine dispute of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Charles A. Wright, et al., Federal Practice & Procedure § 2720 (3d ed. 1998).

### III. Applicable Law

In diversity actions, a district court applies the substantive law and choice of law rules of the state in which the court sits. *Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600, 605 (D.Md. 2002) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)). In contract claims, Maryland applies the doctrine of *lex loci contractus*, meaning that the law of the place where the contract was made applies. A*llstate Ins. Co. v. Hart*, 327 Md. 526, 529 (1992). "The *locus contractus* is the place where the last act is performed which makes an agreement a binding contract." *Grain Dealers Mut. Ins. Co. v. Van Buskirk*, 241 Md. 58, 65–66 (1965). In an insurance contract, the delivery of the policy and the payment of the premiums constitute the "last act." *Id.* at 66 (citing *Sun Ins. Office v.*

*Mallick*, 160 Md. 71, 81 (1931)). Defendant, a Maryland resident, received the policy in Maryland. Therefore, Maryland substantive law applies to this dispute. Maryland law does not, however, govern procedural rules in this court, even when jurisdiction is based on diversity, and it does not apply when there is conflicting federal law.

"In an action for declaratory judgment, the burden of proof is not put on the plaintiff merely because he has filed the action, rather the Court must examine the underlying issues to determine the burden of proof." *Reasor v. City of Norfolk, Va.*, 606 F.Supp. 788, 793 (E.D. Va. 1984); (citing *Royal Indemnity Co. v. Wingate*, 353 F.Supp. 1002, 1004 (D.Md.), aff'd. 487 F.2d 1398 (4th Cir.1973); *Medtronic Inc. v. Mirowski Family Ventures, LLC*, 134 S.Ct. 843, 849-50 (2014) (holding that a declaratory judgment action did not shift the burden of proof for patent infringement related actions). Here, the parties' dispute involves a possible breach of an insurance contract.

In an insurance coverage dispute, the insured has the initial burden "of proving all elements of a prima facie case including the existence of a policy, payment of applicable premiums, compliance with policy conditions, the loss as within policy coverage, and the insurer's refusal to make payment when required to do so by the terms of the policy." 17A Couch on Ins. § 254:11 (3rd ed. 2017). Thereafter, the insurer must prove

the applicability of an exclusion or limitation, or other affirmative defenses. Couch, § 254:12; *see Hartford Acc. and Indem. Co. v. Sherwood Brands, Inc.*, 111 Md.App. 94 (1996), *vacated on other grounds*, 347 Md. 32 (1997). Furthermore, "UM/UIM liability limits contained in the declarations page generally cap the insurer's total liability per claim." 12 Couch, § 171:13. In a contract action for recovery of uninsured motorist coverage, the insured would have "to prove the amount of [] contract damages, *i.e.*, establish the amount of her underinsured motorist coverage . . ." *Allstate Ins. Co. v. Kponve*, 225 Md.App. 370, 388 (2015).

## IV. Analysis

The parties transacted all aspects of this insurance relationship electronically, beginning in 2009. Plaintiff asserts that the resulting contract is valid, including the UM waiver. Defendant, on the other hand, somewhat curiously, contends that he did not agree to transact business electronically, making his UM waiver invalid. Carried to its logical conclusion, however, that argument would undermine the validity of the entire contract, not simply the UM waiver, and he would be unable to prove that he had a policy with Progressive at all.

The parties have framed their differences based exclusively on a provision in Maryland law, "Maryland Uniform Electronic

Transactions Act" ("MUETA"), Md.Code Ann., Com. Law § 21-101 et seq. One section of that Act, Section 21-104(b)(3), provides: "Except for a separate and optional agreement the primary purpose of which is to authorize a transaction to be conducted by electronic means, a provision to conduct a transaction electronically may not be contained in a standard form contract unless that provision is conspicuously displayed and separately consented to."

Based on that section, Defendant contends that his "signature" on the UM waiver form was invalid. Plaintiff, of course, disagrees. Before addressing that precise issue, it is helpful to recount the history of Maryland's enactment of the statute, and the parallel federal statute, "Electronic Signatures in Global and National Commerce Act" ("E-SIGN"), 15 U.S.C. § 7001 et seq., which is not mentioned by the parties. As will be seen, Defendant's arguments are unavailing and the court will declare that Progressive has no further obligation to Mr. Corekin concerning UM benefits.

### A. Electronic Contracts

In the latter part of the 20th century, as electronic transactions became more and more prevalent and allowed for agreements to be reached across vast geographic expanses, policy makers and commercial actors recognized that the law needed to be updated to accommodate the new technology. Moreover, to

encourage further e-commerce, the law needed to be uniform. In light of this new reality, the National Conference of Commissioners on Uniform State Laws (NCCUSL) approved a project to create a proposal for a uniform model act. Anthony M. Balloon, *From Wax Seals to Hypertext: Electronic Signatures, Contract Formation, and A New Model for Consumer Protection in Internet Transactions*, 50 Emory L.J. 905, 908-909 (2001); Robert A. Wittie & Jane K. Winn, *Electronic Records and Signatures Under the Federal E-SIGN Legislation and the UETA*, 56 Bus. Law. 293, 294-97 (2000).

In 1999, NCCUSL approved the Uniform Electronic Transactions Act ("UETA"). Patricia Brumfield Fry, *Introduction to the Uniform Electronic Transactions Act: Principles, Policies and Provisions*, 37 Idaho L. Rev. 237, 248 (2001). UETA is designed "to facilitate electronic transactions consistent with other applicable law." UETA § 6(1) (Nat'l Conference of Comm'rs on Unif. State Law 1999). UETA is technology-neutral. It does not require, prefer, or discourage one type of technology but rather allows for parties to choose the technology they desire. UETA is also minimalist. UETA "applies only to transactions between parties each of which has agreed to conduct transactions by electronic means." UETA § 5(b). When the parties have agreed to transact electronically, UETA simply provides:

> (a) A record or signature may not be denied legal effect or enforceability solely because it is in electronic form.
> (b) A contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation.
> (c) If a law requires a record to be in writing, an electronic record satisfies the law.
> (d) If a law requires a signature, an electronic signature satisfies the law.

§ 7.

Even before NCCUSL could finalize UETA, members of Congress incorporated UETA's principles into proposed legislation designed to ensure the validity of electronic signatures on a national basis.[3] On March 25, 1999, Senator E. Spencer Abraham introduced the "Millennium Digital Commerce Act." S. 761, 106th Cong. (1999). On May 6, Congressman Thomas J. Bliley, Jr. introduced the "Electronic Signatures in Global and National Commerce Act." H.R. 1714, 106th Cong. (1999). The bills had similar operative effects and adhered to UETA's key provisions. Both bills contained a prohibition on denying a contract's validity solely because it was initiated through electronic means, H.R. 1714 § 101(a); S. 761 § 6(a), and both bills were technology-neutral, allowing parties to choose the technology

---

[3] Although UETA was not approved until July 1999, a version was discussed at the NCCCUSL annual meeting in 1998 and its provisions were known. Fry at 247-48; Wittie & Winn at 296.

they preferred and enforcing that choice,    H.R. 1714 § 101(b); S. 761 § 5.

The bills differed in their preemptive effect.    The Senate version provided:

> Nothing in this section shall be construed to preempt the law of a State that enacts legislation governing electronic transactions that is consistent with subsections (a) and (b).    A State that enacts, or has in effect, uniform electronic transactions legislation substantially as reported to State legislatures by the National Conference of Commissioners on Uniform State Law shall be deemed to have satisfied this criterion, provided such legislation as enacted is not inconsistent with subsections (a) and (b).

S. 761 § 6(c).    In comparison, the House version allowed for a state law to "modify, limit, or supersede" the provision of federal law if the state law referenced the federal law, specified alternative procedures to make valid electronic agreements, was adopted within two years of the federal law, and did not discriminate on the basis of the size of the business or the type of technology employed.    H.R. 1714 § 102(a), 102(b).

The House passed its bill on November 9, 1999 and the Senate bill passed on November 19.    The House and Senate conferenced and produced the final version of the bill.    The bill subsequently passed both houses of Congress and was signed into law.    The final version contained the same prohibition on invalidating electronic agreements solely because they were

electronic and allowed transacting parties to choose their preferred technology. The bill, however, contained a preemption clause that was a hybrid between the House and Senate language. Like the House Version, it adopted the "modify, limit, or supersede" language. Like the Senate version, it specifically allowed for superseding the federal law by adopting UETA. 15 U.S.C. § 7002(a)(1). Like the House version, it also allowed for a state to supersede the federal law through an alternative version that was consistent with federal law, was technology-neutral, and, if enacted after the federal law, made "specific reference" to the federal law. § 7002(a)(2). E-SIGN was enacted into law on June 30, 2000.

Meanwhile, in December 1999, companion bills based on UETA were introduced in the Maryland General Assembly. As the bills were pending, Assistant Attorney General Steven Sakamoto-Wengel wrote to the legislature on behalf of Maryland's Office of the Attorney General, Consumer Protection Division. In the letters, he raised concerns that UETA would undermine requirements that certain contract terms "be set apart from other contract provisions and, in many cases, separately initialed by consumers," and that, "under the proposed UETA, consumers could sign a piece of paper in a person-to-person transaction – even when the consumer does not own a computer – and still find that all notices, disclosures and records relating to that

transaction [were] posted on a website in their name." Letter from Assistant Attorney General Steven Sakamoto-Wengel to the Honorable Thomas L. Bromwell, Chairman, S. Fin. Comm. (Feb. 3, 2000) (on file with the Maryland State Law Library) ("Sakamoto-Wengel Letter") (for ease of access, available at ECF No. 32-1). He proposed a number of amendments, "the most important amendment," was copied from Cal. Civ. Code § 1633.5(b).[4] The proposal stated, "Except for a separate and optional agreement the primary purpose of which is to authorize a transaction to be conducted by electronic means, an agreement to conduct a transaction by electronic means may not be contained in a standard form contract that is not an electronic record."[5] ("Sakamoto-Wengel Letter"). The "amendment [was] designed to ensure that an agreement to communicate electronically is not found from mere boilerplate in a paper communication." *Id.*

Although the Committee agreed with the purpose of the Assistant Attorney General's amendment, it "rejected the specific language" and instead "*crafted clearer language* to largely reflect the spirit of the proposed language." *Id.* The

---

[4] Hawaii inserted this clause into its own version of UETA. Haw. Rev. Stat. Ann. § 489E-5.

[5] A standard form contract is a "preprinted contract containing set clauses, used repeatedly by a business or within a particular industry with only slight additions or modifications to meet the specific situation." *Black's Law Dictionary* (10th ed. 2014).

new language, which was enacted into law as Section 21-104(b)(3) of the Maryland Commercial Law Article, provides: "Except for a separate and optional agreement the primary purpose of which is to authorize a transaction to be conducted by electronic means, a provision to conduct a transaction electronically may not be contained in a standard form contract unless that provision is conspicuously displayed and separately consented to." Com. Law § 21-104(b)(3).[6] Despite the changes, the amendment still "address[ed] the . . . concern that a person could unwittingly assent to conduct a transaction by overlooking a provision in a form contract." S. Fin. Comm., "Defense of Committee Amendments Adopted," 2000 Sess. S.B. 3 (on file with the Maryland State Law Library) (for ease of access, available at ECF No. 32-2). The final bill was passed into law and became effective June 1, 2000.

As the parties have identified, this case revolves around Section 21-104(b)(3). Defendant argues that Progressive's standard form contract did not satisfy Section 21-104(b)(3) and therefore he never agreed to transact business electronically and could not effectively waive the default UM coverage. Plaintiff argues that its contract satisfies Section 21-

_____

[6] This language is also part of Virginia's version of UETA. Virginia adopted UETA contemporaneously with Maryland. *See* Va. Code Ann. § 59.1-483(b).

14

104(b)(3) and, alternatively, the parties' course of conduct established an agreement under Section 21-104(b)(2).[7]

In his argument, Defendant interprets Section 21-104(b)(2)'s more general provision for all forms of contracts to conflict with Section 21-104(b)(3)'s more specific provision for standard form contracts. Citing to "[t]he well-accepted law on statutory construction . . . that where general provisions, terms or expressions in one part of a statute are inconsistent with more specific or particular provisions in another part, the particular provisions must govern or control," he concludes that Section 21-104(b)(3)'s provision for standard form contract must control over Section 21-104(b)(2)'s provision for all contracts. Thus, under his logic, Defendant's signed electronic contract cannot establish an agreement, even though a paper agreement would have been effective, because it failed to satisfy requirements not imposed on agreements in other mediums. Defendant's argument fails to appreciate the interplay of E-SIGN and MUETA.

Assuming arguendo that his interpretation of MUETA is correct, then Section 21-104(b)(3) would be preempted. Under E-SIGN, a state law cannot "den[y] legal effect, validity or

_____

[7] Plaintiff also argues, somewhat circularly, that its agreement to authorize an electronic transaction is not part of the standard form contract because it is separate and optional. (ECF No. 27-7). This argument does not need to be addressed.

enforceability [of a contract] solely because an electronic signature or electronic record was used in its formation." 15 U.S.C. §§ 7001(a)(2); 7002(a)(2)(A)(i). Here, Defendant's argument is that despite the payments, signatures, and correspondence, the contract is a legal nullity because it was done electronically and failed to adhere to additional standards for electronic agreements. (ECF No. 26-1, at 10). This interpretation of MUETA would deny legal effect to an agreement "solely because it is in electronic form." 15 U.S.C. § 7001(a)(1). As such, Section 21-104(b)(3) would violates E-SIGN's technology-neutral requirement and would be preempted. 15 U.S.C. §§ 7001(a)(2); 7002(a)(2)(A)(i).

If E-SIGN preempts MUETA, then 15 U.S.C. § 7001(a)(1) would control which has no special clause for standard form contracts. This provision would allow for an electronic signature to create a legally binding agreement as along as both parties agreed to use electronic means. 15 U.S.C. § 7001(a)(1), (b)(2). This provision of E-SIGN is the same as UETA and case law applying the unamended UETA supports finding that the course of conduct here establishes an agreement to conduct transactions electronically. *See, e.g.*, *Stover-Davis v. Aetna Life Ins., Co.*, No. BAM-15-1938, 2016 WL 2756848, *4 (E.D. Cal. May 12, 2016)(concluding parties had an intent to conduct transactions electronically and finding an electronic contract valid because

the plaintiff had created an online account and electronically signed the agreement); *Rosas v. Macy's, Inc.*, No. PSG-11-7318, 2012 WL 3656274, *6 (C.D. Cal. Aug. 24, 2012) (finding an electronically signed form with language stating a signature was an agreement to contract electronically constituted an agreement to conduct transactions electronically); *Traynum v. Scavens*, 786 S.E.2d 115, 120 (S.C. 2016), *reh'g denied* (June 17, 2016) ("Progressive's online communication of the offer of UIM coverage was effective because Traynum agreed to interact with Progressive electronically by choosing to purchase insurance through Progressive's website[.]"); *Waddle v. Elrod*, 367 S.W.3d 217, 228 (Tenn. 2012) (holding that an email exchange between parties' attorney "evidenced an intent to finalize the settlement by electronic means"); *see also* UETA § 5, Comment 4(D) ("If one orders books from an on-line vendor, such as Bookseller.com, the intention to conduct that transaction and to receive any correspondence related to the transaction electronically can be inferred from the conduct."). Thus, Defendant's conduct would signify assent to use electronic means, and Defendant's signature on the UM waiver would establish a waiver.

At least one commentator flatly stated at the time MUETA was passed that that the unique provision of Maryland law would be preempted by E-SIGN. Carla Stone Witzel, *Electronic Laws:*

*More details on the digital signature laws*, Baltimore Business Journal, Sept. 18, 2000, https://www.bizjournals.com/baltimore/stories/2000/09/18/focus5. html ("The Maryland legislature added a unique requirement to UETA that will be pre-empted by the federal Electronic Signature Act when it becomes effective in October. Under the Maryland UETA, an agreement to conduct a transaction electronically may not be contained in a standard form contract, unless the provision is conspicuously displayed and separately consented to."). It is not clear, however, that Ms. Witzel's prediction and Defendant's interpretation is correct. Instead, Section 21-104(b)(3)'s provision can be interpreted in harmony with Section 21-104(b)(2) and in a way to satisfy the exemption from preemption in E-SIGN.

As the Court of Appeals of Maryland has repeatedly explained, "The cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the Legislature. A court's primary goal in interpreting statutory language is to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *State v. Johnson*, 415 Md. 413, 421 (2010) (internal quotation marks omitted). "When the plain meaning language is clear and "consistent with the statute's apparent purpose," the "inquiry as to legislative intent ends

ordinarily." *Id.* (internal quotation marks omitted). The statutory language, however, is not read in a vacuum. "Rather, the plain language must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute." *Id.* (internal quotation marks omitted). It is presumed that "the Legislature intends its enactments to operate together as a consistent and harmonious body of law." *Id.* (internal quotation marks omitted). "Where the words of a statute are ambiguous and subject to more than one reasonable interpretation, or where the words are clear and unambiguous when viewed in isolation, but become ambiguous when read as part of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process. In resolving ambiguities, a court considers the structure of the statute, how it relates to other laws, its general purpose, and the relative rationality and legal effect of various competing constructions." *Id.* (internal quotation marks omitted).

Under E-SIGN, preemption is avoided if a provision satisfies either of two methods for a state law to "modify, limit, or supersede" E-SIGN's provisions. One method is if MUETA "constitutes an enactment or adoption of the Uniform

Electronic Transactions Act." 15 U.S.C. § 7002(a)(1). E-SIGN provides no answer as to how to determine whether a law, such as MUETA, modeled on UETA but containing additional provisions "constitutes an enactment" of UETA for the purposes of Section 7002(a)(1). This point is likely academic as any law that could "constitute[] an enactment" of UETA would likely satisfy the alternative provided in Section 7002(a)(2).[8]

Pursuant to Section 7002(a)(2), a state statute can exceed the federal statute if it provides a method to establish the legal validity of electronic records, the methods are consistent with federal law, and the methods do not give preference to one technology over another.[9] 15 U.S.C. § § 7002(a)(2). Section 21-

_____

[8] The interpretation of the first clause has been the topic of some scholarly debate but few judicial opinions. *See, e.g.*, Robert Carson Godbey & William G. Meyer, III, *Contracting in Cyberspace*, 5-Feb Haw. B.J. 6 (2001)("Commentators have noted that the preemption provisions of E-SIGN are somewhat unclear. It may take court review to determine how to interpret these provisions of E-SIGN and their effect on Hawaii's version of UETA."); Adam R. Smart, *E-Sign Versus State Electronic Signature Laws: The Electronic Statutory Battleground*, 5 N.C. Banking Inst. 485, 498-99 (2001) ("However, until there is judicial review of the [scope of E-SIGN's preemption clause] or regulatory clarification, it may be impossible to determine with certainty what the outcome would be in a state that has enacted a non-uniform UETA.") (internal citation omitted).

[9] 15 U.S.C. § 7002(2)(B) states that enact such a law, "if enacted or adopted after June 30, 2000, [must] make[] specific reference to this chapter." MUETA was adopted June 1, 2000, and, therefore, this provision does not apply to it.

104(b)(3) can be interpreted to fulfill the criteria set forth in 15 U.S.C. § 7002(a)(2) and to avoid preemption.

First, the Maryland provision clearly "specifies the alternative procedures or requirements for the use or acceptance (or both) of electronic records or electronic signatures to establish the legal effect . . . of contracts or other records." 15 U.S.C. § 7002(a)(2)(A). Here, electronic records are accepted and legally enforceable when "the parties [have] agreed to conduct transactions by electronic means." Com. Law §§ 21-104(b)(1); 21-106.

In addition, Section 21-104(b)(3) can be read to be consistent with 15 U.S.C. § 7001's requirements. *See* 15 U.S.C. § 7002(a)(2)(A)(i). Under Section 7001, electronic agreements are legally enforceable, but no person can be required "to use or accept electronic records or electronic signatures." § 7001(b)(2). MUETA provides for the legal enforceability of contracts, Com. Law § 21-106, and Section 21-104(b)(1) creates the same threshold question as the federal law: has a person agreed to conduct transactions electronically or are they being forced to do so without consent? *See* 15 U.S.C. § 7001(b)(2). Although federal law does not provide much guidance to answer that question, Maryland law provides a method to determine whether parties have chosen to use electronic means. Courts look to "the context and surrounding circumstances, including

the parties' conduct," Com. Law § 21-104(b)(2), but courts cannot infer an agreement "solely from the fact that a party has used electronic means to pay an account," Com. Law § 21-104(b)(4). In the case of a standard form contract, a provision authorizing electronic transactions can, by itself, demonstrate an agreement to conduct electronic transactions if that provision is separate and optional from the rest of the agreement or conspicuously displayed and separately consented to. Com. Law § 21-104(b)(3). Even without such a freestanding provision, however, the parties' conduct would still be relevant and could establish a valid agreement. Com. Law § 21-104(b)(2).

This interpretation of Section 21-104(b)(3) better comports with the text, structure, and history of MUETA. First, Section 21-104(b)(3) never says a standard form contract, itself, is invalid because it does not contain an electronic authorization section outside the body of the contract. It simply says the electronic authorization clause would not be effective. Defendant's reading adds a provision not found in the statute to invalidate the entire contract whereas this alternative reading abides more closely to the language of the statute which only applies to the agreement to conduct transactions electronically.

Moreover, although "[i]t is an often repeated principle that a specific statutory provision governs over a general one," *Lumbermen's Mut. Cas. Co. v. Ins. Comm'r*, 302 Md. 248, 268

(1985), "when two statutes are capable of coexistence, it is the duty of the courts . . . to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). Reading Section 21-104(b)(3) simply to invalidate clauses in standard form contracts that do not meet its specification without affecting 21-104(b)(2)'s rule for determining whether parties have agreed to conduct transactions electronically based on conduct harmonizes the two parts. It allows for the provisions to achieve the Maryland legislature's dual goals of "facilitating electronic transactions," Com. Law § 21-105(1), while "limiting the application of [MUETA] to transactions where the parties have agreed to conduct transactions electronically." Maryland Bill History, 2000 Sess. S.B. 3.

Furthermore, the legislative history demonstrated a specific concern that "a person could *unwittingly* assent to conduct a transaction electronically by overlooking a provision in a form contract." Defense of Committee Amendments Adopted (emphasis added). It simply does not make sense that an amendment designed to protect the unwitting would apply to invalidate Defendant's agreement which was initiated electronically, consented to electronically, and was exclusively done via electronic means. This alternative interpretation does make sense. Under that reading, a person who agrees on paper to a standard form contract with an electronic authorization

provision and conducts all business in person cannot later be bound to conduct electronic transactions because the facts and circumstances do not demonstrate an agreement to conduct transactions electronically. *See* Com. Law § 21-104(b)(3). On the other hand, a person who initiates a transaction electronically, signs a standard form contract electronically, and conducts all business electronically can later be bound to conduct business electronically because the facts and circumstances demonstrate an agreement to conduct transactions electronically. *See* Com. Law § 21-104(b)(2).[10] Thus, Section 21-104(b)(3) can be read as an elaboration in the standard form context of the general rule outlined in E-SIGN that a party must agree to use electronic means before being bound to an agreement, and be consistent with that law. *See* 15 U.S.C. § 7001(a), (b)(2); Md.Code Ann., Com. Law § 21-104(b)(1). Although this interpretation appears superior to Defendant's suggested interpretation, it is enough to say that this interpretation would be a valid one and would satisfy E-SIGN's technology-neutrality requirement, the second element of E-SIGN's preemption analysis.

---

[10] If the Maryland provision applies only to standard form contracts not done through electronic means, as initially proposed, then it also would not be preempted because it does not affect the validity of electronic contracts.

Lastly, Section 21-104(b)(3) "do[es] not require, or accord greater legal status or effect to, the implementation or application of a specific technology or technical specification[.]" 15 U.S.C. § 7002(a)(2)(A)(ii). It involves disclosure and makes no reference to one form of technology or another. It does not run afoul of the technology-neutrality requirement of 15 U.S.C. § 7002(a)(2)(A)(ii).

Under this reading, Section 21-104(b)(3) of the Maryland Commercial Law Article would not be preempted by E-SIGN. Despite the parties' devoting much of their arguments to the question of whether the electronic authorization was either separate and optional or conspicuously displayed and separately consented to, this interpretation renders it is unnecessary to resolve that issue. The abundant evidence of consent from the parties' course of dealings would demonstrate an agreement to conduct transactions electronically. *See* Com. Law § 21-104(b)(2).

Here, Defendant made an account online to facilitate his transactions with Plaintiff. (ECF No. 25-5, at 2). Defendant initially applied online. (*Id.* at 1). Defendant received electronic copies of his policy documents. (*Id.* at 5). Defendant communicated with Plaintiff electronically. (*Id.* at 5). Defendant received a discount on his insurance premiums for agreeing to conduct his transactions electronically. (ECF No.

25-7). Defendant paid each policy premium electronically. (ECF No. 25-5, at 5). Defendant and Plaintiff's conduct would establish an agreement to conduct transactions electronically. *See* Com. Law § 21-104(b)(2). Therefore, Defendant's electronic signature would signify his assent to the insurance policy, bound him to its terms, and waived the default UM coverage. *See* Com. Law §§ 21-104(b)(2), 106.

Ultimately, it is unnecessary conclusively to resolve the correct interpretation of Section 21-104(b)(3) because Defendant has not advanced any argument that would entitle him to void the agreement. Therefore, the agreement is valid and Defendant signified assent to the terms of the insurance agreement including its waiver of default UM coverage.

**B. Insurance Waiver**

Defendant argues alternatively that the electronic contract was not a valid waiver of UM default coverage. Defendant argues the waiver form did not comply with the Maryland statutory requirements for a waiver of UM default coverage because, even though MIA posted the form as a model on its website, MIA did not "require" the form. (ECF No. 26-1, at 3).

Under Maryland law, a person can waive the default UM coverage in an insurance policy, but, for the waiver to be effective, the insurer must first provide the person with certain information about UM coverage in a particularized format

and then the person must assent to the waiver. *See* Md.Code Ann., Ins. § 19-509(b)(1). Pursuant to Section 19-510(d)(1) of the Maryland Insurance Article, an insurer must provide a waiver form in readable print with key, statutorily mandated information "on the form that the [MIA] Commissioner requires." Plaintiff argues that it complied with these statutory dictates because it used a form posted on MIA's website that had all the necessary information in the proper format. (ECF No. 25-1, at 15).

In a nearly identical situation, the Court of Appeals of Maryland already rejected an argument that a waiver form was invalid when it was only approved by the MIA. In *Nesbit v. Government Employees Insurance Co.*, 382 Md. 65 (2004), the MIA had approved a form used by GEICO for a personal injury protection ("PIP") waiver. It concluded that a waiver was on "the form that the [MIA] Commissioner requires" as long as it correctly laid out all the information that the statute necessitated. Ins. § 19-506(d)(1); *Nesbit*, 382 Md. at 79. The court noted that its conclusion was buttressed by MIA's approval of the form at-issue because "[a]n administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts." *Nesbit*, 382 Md. at 80 (internal quotation marks omitted).

Here, the form Plaintiff used included all the required information in the appropriate format. MIA also posted this precise form on its website as an example of an effective waiver and, as in *Nesbit*, MIA's endorsement and support for this form is entitled to deference. *See Nesbit*, 382 Md. at 80. Thus, "it is clear that the . . . waiver form provided by [Plaintiff] satisfies the requirements" of Section 19-510(d). *Id.* at 80.

## C. Certification

Defendant requests that this court certify a question to the Court of Appeals of Maryland. (ECF No. 26-1, at 11). "A federal court's certification of a question of state law to that state's highest court is appropriate when the federal tribunal is required to address a novel issue of local law which is determinative in the case before it." *Grattan v. Bd. of Sch. Comm'rs of Baltimore City*, 805 F.2d 1160, 1164 (4th Cir. 1986). Here, Defendant has dug himself too deep a hole for certification to be appropriate. In this case, if the question were certified to the Court of Appeals of Maryland and Defendant's electronic signature, payments, and communications did not establish an agreement because he had never *agreed* to use the means which he had *chosen* to use, a somewhat far-fetched argument, then, as explained above, E-SIGN would preempt Maryland law as the agreement would have been denied legal effect *solely* because it was done electronically and Plaintiff

would be entitled to declaratory relief. If the Court of Appeals of Maryland found Defendant had entered into this agreement, then Plaintiff would also be entitled to declaratory relief. In a closer case, it might be appropriate to certify. In this case, respect for state courts requires the resolution of the case without resort to certification because certification would result in an expenditure of resources on an issue that would not change the ultimate outcome. *See Lehman Bros. v. Schein*, 416 U.S. 386, 390-91 (1974). Accordingly, certification is denied.

## V.    Conclusion

For the foregoing reasons, Plaintiff's motion for summary judgment will be granted and Defendant's cross motion for summary judgment will be denied. A separate order will follow.


_____/s/_____
DEBORAH K. CHASANOW
United States District Judge